*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0367P (6th Cir.)
File Name: 02a0367p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TANYA L. MARCHWINSKI;
TERRI J. KONIECZNY;
WESTSIDE MOTHERS, on
behalf of all similarly situated
persons,
  *Plaintiffs-Appellees,*

   *v.*

DOUGLAS E. HOWARD, in his
official capacity as Director of
the Family Independence
Agency of Michigan, a
governmental department of
the State of Michigan,
  *Defendant-Appellant.*

No. 00-2115

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 99-10393—David M. Lawson, District Judge.

Argued: January 30, 2002

Decided and Filed: October 18, 2002

Before:  SUHRHEINRICH, SILER, and BATCHELDER,
Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Morris J. Klau, OFFICE OF THE ATTORNEY GENERAL, Detroit, Michigan, for Appellant.  Robert A. Sedler, Detroit, Michigan, for Appellees.  **ON BRIEF:** Morris J. Klau, OFFICE OF THE ATTORNEY GENERAL, Detroit, Michigan, for Appellant.  Robert A. Sedler, Detroit, Michigan, Graham A. Boyd, ACLU DRUG POLICY LITIGATION PROJECT, New Haven, Connecticut, for Appellees.  Paul D. Kamenar, WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Circuit Judge.  Defendant-appellant Douglas Howard, the director of the Michigan Family Independence Assistance program ("FIA"), appeals the district court's grant of a preliminary injunction based on Michigan's failure to identify a "special need" related to public safety that would allow the state—without a requirement of individualized suspicion— to drug test the plaintiff-appellees, a class of persons eligible for or receiving welfare assistance and subject to drug testing under MICH. COMP. LAWS ANN. § 400.57l.  Because we find that safety need only be a factor in the state's special need; that section 400.57l is supported by a public safety special need; and that under *Wyman v. James*, 400 U.S. 309 (1971), the condition attached by section 400.57l to the receipt of welfare benefits is constitutional, we reverse.

For all of these reasons, we conclude that the district court erred in issuing the preliminary injunction.  Accordingly, we REVERSE the judgment of the district court.

## I.

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") that replaced the previous welfare entitlement program with the Temporary Assistance for Needy Families program ("TANF").  Pub. L. 104-193, § 103, 110 Stat. 2113 (1996) (codified at 42 U.S.C. § 601 *et seq*.).  Among the general purposes for the PRWORA is the goal of increasing the flexibility of the states in providing assistance to needy families "so that children may be cared for in their own homes or in the homes of relatives."  42 U.S.C. § 601(a)(1). A state participating in the TANF program must submit to the Secretary of Health and Human Services a written document that includes, among other things, the state's plan for a program that will "provide[] assistance to needy families with (or expecting) children and provide[] parents with job preparation, work, and support services to enable them to leave the program and become self-sufficient."  42 U.S.C. § 602(A)(1).  Only needy families who have or are expecting children are eligible for benefits under this program. 42 U.S.C. § 602(1)(A)(i).  PRWORA explicitly provides that the Act "shall not be interpreted to entitle any individual or family to assistance under any State program funded under this part."  42 U.S.C. § 601(b).  TANF permits states to drug test applicants for and recipients of these benefits and to impose sanctions where use of controlled substances is found. 21 U.S.C. § 862b.

In Michigan, the Family Independence Agency provides TANF block-grant moneys through the Family Independence Program ("FIP") to eligible families needing assistance. Section 400.571(1) of MICH. COMP. LAWS ANN. expressly permits the FIA to condition eligibility for FIP assistance on the recipient's being tested for substance abuse.  Section 400.571(2) requires the FIA "to implement a pilot program of substance abuse testing as a condition for family independence assistance eligibility in at least 3 counties, including random substance abuse testing."

The FIP's Program Eligibility Manual ("PEM"), which sets out the program's goals, notes that "[b]ecause having strong family relationships may be more difficult if there is substance abuse . . . and because substance abuse is a barrier to employment" the state of Michigan has piloted drug testing. Under the pilot program, applicants for benefits are tested prior to receiving benefits; every six months twenty percent of recipients are randomly selected for drug screening. Testing is done by urinalysis (not in a direct line of sight, for greater privacy) and samples are tested only for illegal drugs. No individual will lose benefits or eligibility for benefits on the basis of one failed urinalysis. An individual who tests positive must go to a treatment agency for a determination of whether that person is a substance abuser; if appropriate, the agency will recommend and the individual must comply with a treatment plan. However, applicants who refuse to take the drug test without good cause and applicants who fail to complete the assessment process or do not comply with a required treatment plan within two months will be refused benefits. Aid recipients who refuse to submit to the random drug testing will lose a percentage of their benefits each month; after four months of failure to cooperate in the testing, such recipients will have all benefits withheld.

On September 30, 1999, the plaintiffs sued in the Eastern District of Michigan to preliminarily enjoin enforcement of section 400.57l, arguing that the challenged Michigan law violated their Fourth Amendment rights because the required testing was done without particularized suspicion. The district court granted the injunction.

Howard appeals, arguing that the district court erred when it held that a public safety "special need" was the only interest that would justify a suspicionless search. Alternatively, Howard contends that Michigan's interest in the prevention of child abuse and neglect is a sufficient public safety concern.

Whether we view the condition imposed by the state in this case as the requirement that the recipient of the benefits submit to the random and suspicionless drug tests, or the requirement that the recipient not use controlled substances—in which event, the drug test is the mechanism by which the state ensures compliance with the condition— we think that the state has made a strong showing that Michigan's program satisfies the *Wyman* factors. The state is attempting to insure that children are adequately cared for through the Family Independence Program, and ascertaining whether the adult recipients of the programs funds are abusing controlled substances is directly related to that end. Further, the public has a strong interest in ensuring that the money it gives to recipients is used for its intended purposes. The state is not using the information it gathers to institute criminal proceedings. As in *Wyman*, application of the warrant and probable cause requirements would be extremely impracticable. And like the search in *Wyman*, it is consensual in the sense that the recipient may refuse to submit to the test, but may not then continue to participate fully in the program. Accordingly, we do not conclude that the plaintiffs have shown irreparable harm if the preliminary injunction does not issue.

In this particular case, the third and fourth factors that comprise the preliminary injunction analysis are substantially identical: whether issuance of the injunction would cause substantial harm to others, and whether the public interest would be served by issuance of a preliminary injunction. Here, the public interest lies insuring both that the public moneys are expended for their intended purposes and that those moneys not be spent in ways that will actually endanger the public. Issuance of the injunction would work to thwart that interest, and to make it much more difficult for the state to ensure that the public at large is not harmed by FIP recipients' use of those moneys for illegal, and indeed criminal, purposes.

Accordingly, we conclude that the plaintiffs have not shown a strong likelihood of success on the merits of their claim.

We turn next to the other factors the district court was required to weigh in determining whether to issue the preliminary injunction, beginning with whether the plaintiffs have demonstrated that they will suffer irreparable injury if the injunction is denied. We conclude that they have not.

The plaintiffs' claimed injury is the violation of their Fourth Amendment right to be free from unreasonable searches. Even were we to conclude that the state could not show a special need sufficient to justify the drug testing, we would nonetheless find that the plaintiffs have not shown that the drug testing is an unreasonable search. Rather, we think that the evidence suggests that the Michigan program imposes a condition on the plaintiffs' receiving the program benefits, and that there has been no showing that the condition is unreasonable. Our conclusion is premised on the language of 42 U.S.C. § 601(b), which explicitly negates any claim of entitlement to any state program funded under the PRWORA, and the reasoning of the Court in *Wyman v. James*, 400 U.S. 309 (1971), an action brought by a welfare recipient who claimed that requiring her to submit to home visits by caseworkers as a condition of receiving benefits constituted an unreasonable search and violated her Fourth Amendment rights. *Id.* at 314. The Court assumed that the home visit was a search and held that the search was reasonable, *id.* at 318. The Court considered the public interest in aiding the dependent children of recipients; the public interest in insuring that welfare benefits are spent on their proper objects; the nonintrusive, limited, means of the search; the civil and noncriminal nature of the objects of the information gained from the search; the impracticability of obtaining a warrant; and the consensual nature of the home visit, *id.* at 318-24, and concluded that the condition itself was reasonable, and the plaintiff was free to refuse to permit the visits but could not then complain about the benefits' being withheld.

## II.

We review the district court's grant of a preliminary injunction for an abuse of discretion. *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n.*, 110 F.3d 318, 322 (6th Cir. 1997). "A district court abuses its discretion when it relies on clearly erroneous findings of fact ... or when it improperly applies the law or uses an erroneous legal standard. Under this standard, this court must review the district court's legal conclusions de novo and its factual findings for clear error." *Owner-Operator Indep. Drivers Ass'n v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000) (internal citations and quotation marks omitted).

When determining whether to issue a preliminary injunction, a district court must consider four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citation omitted). When considering these factors the district court should balance each factor against the others to arrive at its ultimate determination. *Id.*

Whether the plaintiffs have a strong likelihood of success on the merits is heavily dependent upon whether Michigan has a "special need" for its drug-testing program, and whether the government's interests outweigh the plaintiffs' reasonable expectation of privacy. *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654-65 (1995). Special needs are those government interests that go "beyond the normal need for law enforcement." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). The Supreme Court has ruled that government has a special need to conduct drug testing in several different circumstances where no particularized suspicion is present: testing of employees of the Customs Service who apply for positions directly involving interdiction of illegal drugs or positions requiring the agent to carry firearms, *Nat'l Treasury*

*Employees Union v. Von Raab*, 489 U.S. 656 (1989); testing of railroad employees involved in train accidents, *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989); testing of student athletes in an effort to prevent the spread of drugs among the student population, *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995); and testing of students who participate in competitive extracurricular activities, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 122 S. Ct. 2559 (2002). This circuit has held that a school district has a special need to test applicants for all safety-sensitive positions in a school district, *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361 (6th Cir. 1998); that a city has a special need to test its municipal bus drivers, *Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475 (6th Cir. 1991); and that a city has a special need to test its firemen and policemen, *Penny v. Kennedy*, 915 F.2d 1065 (6th Cir. 1990).

In *Earls*, the most recent case decided by the Supreme Court pertaining to suspicionless drug testing, the Court found that the school district's interest in preventing drug abuse was sufficient to justify the testing program in light of the nationwide drug epidemic, the evidence provided by the district that drug abuse was a problem among its students and the "special responsibility" undertaken by the district to care for the children in its charge. *Earls*, 122 S. Ct. at 2567-68. The Court said that the students had diminished privacy interests because of the "public school environment where the State is responsible for maintaining discipline, health, and safety [and because s]choolchildren are routinely required to submit to physical examinations and vaccinations against disease." *Id.* at 2565. Examining the character of the students' privacy interests, the Court found that, in light of the method for collecting the test samples—unobserved urination—and the fact that the test determined only the presence of illicit drugs and the test results were available only to school personnel and only on a "need to know" basis, any intrusion into a student's privacy was "minimal[]." *Id.* at 2566. Also important was the fact that a failed drug test had no criminal consequences, but resulted, at most, in a

We turn first to the character of the privacy intrusion. The program at issue here requires applicants and randomly selected recipients of the FIP benefits to provide a urine sample. Like the procedures at issue in *Earls*, 122 S. Ct. at 2566, and *Skinner*, 489 U.S. at 626, the system here allows for unobserved sample collection, and like the tests approved by the Court in *Earls*, 122 S. Ct. at 2566-67, and *Acton*, 515 U.S. at 658, the system utilized by Michigan tests only for illicit drugs and does not seek any other information. Finally, the test results are released only to "a limited class of ... personnel who have a need to know" and are not used for criminal proceedings. *Acton*, 515 U.S. at 658. *See also Earls*, 122 S. Ct. at 2566-67. All of these factors point to a conclusion that the intrusion is limited.

Turning to the nature of the privacy interest, it is clear that the plaintiffs have a somewhat diminished expectation of privacy. First, welfare assistance is a very heavily regulated area of public life with a correspondingly diminished expectation of privacy. *Skinner*, 489 U.S. at 627-28; *Knox County Educ. Ass'n*, 158 F.3d at 379. The federal government provides the parameters within which the states may attempt to meet their goals. The states themselves heavily regulate the provision of welfare assistance. Applicants for welfare benefits are required by these regulations to relinquish important and often private information, and are aware that their receipt of these benefits is accompanied by a diminished expectation of privacy with regard to that information.

Given Michigan's strong interest in ensuring that the public moneys it expends through the FIP are used to foster the purposes of the FIP and to provide for the welfare of the children of the FIP recipients, and the plaintiffs' diminished expectation of privacy, the plaintiffs have not demonstrated that their privacy interests are outweighed by the interests of the state.

all of these reasons, we conclude that the district court erred in holding that Howard could not establish that the state has a special need sufficient to justify the drug testing program.

In determining whether the plaintiffs have demonstrated a strong likelihood of success on the merits we must also consider whether the evidence supports their contention that the means chosen by Michigan are not "effective" to vindicate the interest Michigan has asserted. *Earls*, 122 S. Ct. at 2569. Here again, we think that the plaintiffs have fallen short. Under Michigan's program, every applicant is tested, and twenty percent of recipients are randomly tested every six months. The objections that counseled against finding constitutional the testing program in *Chandler*—that the tests called for by the statute were predictable and infrequent and therefore ineffective—counsel in favor of the use of random and suspicionless testing here. And here, Howard has provided evidence that the tests so far conducted have resulted in approximately ten percent positive results, demonstrating that the means utilized by Michigan are effective in detecting drug abuse among aid recipients. *See also Von Raab*, 489 U.S. at 676 (rejecting the argument that persons subject to testing will be able to manipulate the test results by abstaining from drug use prior to the test).

Finally, we must examine the extent of the intrusion into the plaintiffs' privacy worked by the drug testing, in order to balance the privacy interests of the plaintiffs against Michigan's special need. We evaluate the asserted privacy interest of the plaintiffs by looking at the character and invasiveness of the privacy intrusion and the nature of the privacy interest. *Acton*, 515 U.S. at 654, 658. Important to the determination of the reasonableness of the expectation of privacy is the extent of regulation of the welfare "industry," *Skinner*, 489 U.S. at 627, the pervasiveness of the testing practice in other areas of life, *id.* at 626, and the voluntary or involuntary nature of the procedure, *Acton*, 515 U.S. at 657; *Wyman*, 400 U.S. at 325.

limitation of the student's privileges to participate in extracurricular activities. *Id.* at 2567. Lastly, the district's "pressing concern" with drug abuse among its students, supported with evidence, was sufficient to justify the intrusion into student privacy. *Id.* at 2568. In reaching this result, the Court rejected the respondents' argument that a special need must based on a "surpassing safety interest[]" and stated that safety merely "factors into the special needs analysis" and that "drug use carries a variety of health risks for children." *Id.*

The plaintiffs—who did not have the benefit of the Court's *Earls* decision either in the district court proceedings or in preparing their brief—rely on language at the end of *Chandler v. Miller*, 520 U.S. 305, 323 (1997), to support their assertion that only a very strong public safety rationale can qualify as a special need. *Chandler* involved a challenge by candidates for high office in the state of Georgia to a Georgia statute requiring candidates for state office to pass drug tests. The Court looked carefully at the interest the state sought to protect by the suspicionless drug testing requirement and concluded that the interest was nothing more than the image the state sought to project of being committed to the struggle against drug abuse. Summing up its finding that this interest fell well short of a special need, the Court concluded: "[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' . . . . But where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search." *Id.*

We do not agree with the plaintiffs that this language stands for the broad proposition that special needs are limited to urgent public safety concerns. In our view, the Court in *Chandler* was merely contrasting the state's public image concerns to a situation in which, unlike that in *Chandler*, public safety would genuinely be in issue. Our reading of *Chandler* is clearly supported by the Court's statement in *Earls*:

Respondents also argue that the testing of nonathletes does not implicate any safety concerns, and that safety is a "crucial factor" in applying the special needs framework. They contend that there must be "surpassing safety interests" or "extraordinary safety and national security hazards," in order to override the usual protections of the Fourth Amendment. Respondents are correct that safety factors into the special needs analysis, but the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike. We know all too well that drug use carries a variety of health risks for children, including death from overdose.

*Earls,* 122 S.Ct. at 2568 (internal citations and quotations omitted).

Of further support is *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995), in which the Court upheld drug testing of high school athletes, not primarily because of safety issues, but instead on the basis of deterring drug use among the children entrusted to the school's care. The Court in *Von Raab* characterized the governmental interest which it found sufficient to justify suspicionless searches as "ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Von Raab*, 489 U.S. at 670. The government's interest in *Von Raab*, while certainly related to safety, was not justified on that basis, but was rather justified because the government had the authority to guard against "bribery and blackmail." *Id.* at 674. *See also O'Conner v. Ortega*, 480 U.S. 709 (1987) (ruling that a search of a doctor's office (at a state hospital) was reasonable, citing the efficiency interests of the governmental employer as sufficient to dispense with the warrant and probable cause requirements); *New Jersey v. T.L.O.*, 469 U.S. 325 (1984) (creating the special needs exception to the probable cause and warrant requirements and upholding as reasonable a search of a student's purse). As these cases demonstrate, although public safety must be a component of a state's special need, it need not predominate.

We are persuaded that the district court erred in holding that only a public safety concern can qualify as a "special need" that may justify suspicionless drug testing. We conclude, therefore, that the district court applied an erroneous legal standard in granting the preliminary injunction. The proper standard is whether Michigan has shown a special need, of which public safety is but one consideration. As we will explain, the evidence in the case at hand establishes that Michigan's special need does encompass public safety concerns, as well as other needs "beyond the normal need for law enforcement." *Earls*, 122 S. Ct. at 2264 (internal quotes omitted).

Primary concerns of PRWORA and TANF are that children of needy families may be cared for in their own or in their relatives' homes, and that the parents of these children may be assisted in overcoming dependence on government programs and in becoming economically self-sufficient. Howard presented to the district court numerous studies supporting the FIA's contentions that controlled substance abuse negatively affects the ability of an individual to obtain and retain employment and to be a responsible and effective parent; that the incidence of controlled substance abuse is higher among recipients of welfare benefits than in the population as a whole; that substance abuse by parents contributes substantially to child abuse and neglect; and that controlled substance abuse is a significant barrier to economic self-sufficiency. We have no doubt that the safety of the children of families in Michigan's Family Independence Program is a substantial public safety concern that must be factored into the determination of whether Michigan has shown a special need to this drug testing program. An additional public safety concern is the risk to the public from the crime associated with illicit drug use and trafficking. And we think it is beyond cavil that the state has a special need to insure that public moneys expended in the FIP are used by the recipients for their intended purposes and not for procuring controlled substances—a criminal activity that not only undermines the objectives of the program but directly endangers both the public and the children the program is designed to assist. For